Mr. Montesinos, Ms. Montesinos, happy to hear from you. Good morning, your honors. My name is Liana Montesinos, and I am counsel for the petitioner. May it please the court. In many cases, when a foreign government incarcerates a persecutor, it shows that it's able and willing to protect the victims. But in this case, we need to look further. In this case, Ms. Cruz escaped a country where gang members were conducting criminal activities within their prison cells with the complicity of the prison guards, and where one such prisoner surveilled her family, threatened her family with death, and sent his gang associates to her home. The Board of Immigration Appeals did not mention this evidence, did not grapple with the legal significant evidence here, and the ones that we discuss in our brief. The Board of Immigration Appeals was... Just as a matter of fact, I'm curious, I don't know the answer to this, the person that came purportedly to deliver the cell phone, do we know who that person was, or the association of that person? The record shows that when Ms. Cruz told a gang member that her phone was not working in order to avoid... I understand that background, but I'm talking about there's somebody then after that came in the street, but she didn't engage him, and he didn't come into the house, he didn't deliver anything. The question is, do we know, is there any evidence of who he was or what his association was? I can provide the exact citation on rebuttal, but we believe it was a gang member because... I don't know why... There's no evidence of that, is there? Alexander then called Ms. Cruz and told her about the attempt to deliver, that he had one of his associates attempt to deliver. Okay, okay, fair enough. Today, I'd like to start with the four categories of legally significant evidence that the board ignored, and then I will discuss how the court should proceed in light of the Attorney General's recent decision reinstating matter of AB. The first category of evidence that the Board of Immigration Appeal ignored, and perhaps the most important facts of this case are that while Alexander was incarcerated, he knew where Ms. Cruz's son went to school, where her husband worked, how she looked like, where she lived, and was able to give orders so that his gang associates outside of prison would go visit her home. This is all happening in a country where the Department of State states that gang members committing crimes in cahoots with the prison guards, it's a serious problem. One of the problems is here that Cruz didn't, the question is whether they were unwilling to protect Cruz, but Cruz never reported any incidents to them. Before someone is unwilling to protect someone, you at least have to give them a chance, and there was never, there were never any reported, there was never any report made about Alexander to the authorities in El Salvador, so, you know, what do you expect from them? Under Orellana, this court has held that a police report is not required if it shows I don't require it, but it certainly doesn't work in your favor, because just as a matter of common sense, if you never give someone a chance to correct a problem, if you never reported it to them, that's a difficult thing. Now, there's a good chance that had you reported, these authorities might have done something about it, because unlike someone who's at large, Alexander was actually under their control, and they could have looked into the whole matter, he was incarcerated, they would have a greater degree of control over him, but they were never given a chance. Your Honor, it is also a matter of common sense that Ms. Cruz didn't file a police report because an incarcerated gang member had this power over her and was able to know where her family was and where she lived and how she looked like, and was able to send a phone check. If he knew all this, there's still no evidence that Alexander ever harmed Cruz or her husband or her son or anyone else. There's no evidence that this individual had actually harmed these relatives. It is precisely because Ms. Cruz fled before that were to happen. She feared so much that he was going to harm her that she fled about two months after she changed her phone number. Well, we're here under a substantial evidence standard from the BIA and AIJ, and they both took the view that there was a failure to prove that the Salvadoran government was unable or unwilling to protect Cruz, and if we ruled for you, it would open up a broad number of cases from people who just claim generally that they were under some kind of suspicion or threat from somebody that they've broken up with. And that would be a very broad extension of the asylum statute, to say the very least, particularly if we overruled both the AIJ and the BIA for absence of substantial evidence. Well, Your Honor, this court has recently decided a similar case in MacDougall, where the board decided on the likelihood of torture based on MacDougall's mental health issues, but failed to consider other factors, such as race and his status as a deportee. The court held that the board had abused its discretion and remanded the case and left the definition of torture for another day. That is what we're asking this court to do today, to see the evidence and see that it is legally significant and that the board should have at least mentioned it. The board's analysis of this case ended with incarceration. They did not acknowledge that Alexander was able and had power to harm Ms. Cruz. And that takes me to the second category of evidence. According to the Department of State, open quotes, gang activities in prisons remained a serious problem, and prisoners reportedly conducted criminal activities from their cells, at times with the complicity of prison guards, ending quotes during appendix 318. The country conditions put Mrs. Cruz's fear. I thought there was a subsequent State Department report that indicated that conditions were in El Salvador. They were at one time very bad, but their conditions were improving in an effort to reduce crime. Your Honor, the board took administrative notice of the 2022 Department of State report, but we believe that the board was wrong in including this report. It was legally faulty for two reasons. It was legally faulty and at best shows that there are changed circumstances in this case. It was legally faulty because it didn't give Ms. Cruz the opportunity to challenge for both truth and significance what the report says. And regarding the changed circumstances, this is not dispositive of Mrs. Cruz's asylum claim. She could still meet the criteria for humanitarian asylum. You know, there are a whole lot of crimes that are never solved in this country. And unfortunately and tragically, every day brings very serious crimes, much more serious, in fact, than what actually happened here. But the fact that a crime is not solved, that would never indicate that American authorities were unwilling or unable to protect a particular individual if that individual never so much as gave them notice of what the offense was. I mean, you know, we're accusing or saying that the Salvadoran government was unwilling or unable in a situation where the government of the United States would be unwilling or able or unable to resolve an offense, even when it wasn't reported. I mean, the fact that something is not reported doesn't mean that the authorities are unwilling or unable to try to look into the matter if they've never been given that chance. Your Honor, there's plenty of evidence in this record to show that there was impunity against gender violence in El Salvador. Also, her brother's murder was not... The board didn't consider that they filed a police report and that the police had done nothing yet to investigate or to arrest the persecutors of her brother. Now, the standard in the Fourth Circuit is that a police report is not required if it is futile or dangerous, and there is overwhelming evidence that, including the brother's murder report, that it would have been futile. They didn't do anything for her brother, and that is significant because in asylum cases or there's serious harm for similarly situated people is relevant. And going back to the country conditions, it really puts Mrs. Cruz's fears of the report being futile or dangerous in context and shows that the government would likely, in the way that they addressed the brother's murder, they would have addressed any other harm that she would have reported. You focus solely on the country conditions? You're not interested in... You're not challenged in the social group? Do you want me to repeat that question again, please? Correct? Do you want me to repeat that question again? You're focused simply on the issue of El Salvador being unable or unwilling to protect people. You're not focused on any issue about particular social group rulings? The parties have agreed that the recent case with the board presents challenges to this court's precedent in AMAYA, and to the extent that the court wants to substantive rule on that issue, we would request for the agency to have an opportunity to reconcile this court's holding with the new precedent. For the third category of evidence, the Salvadorian government as stated... Going back briefly to that, we have a precedent that says El Salvador women is a particular group? AMAYA v. Rosen says that it holds that particularity doesn't have to be restricted because a group can be subdivided. Have we ever addressed whether the group entitled El Salvadorian women is inappropriate? I don't have the answer to that, Your Honor. I can address that on rebuttal. That's basically half the population, right? Your Honor, both of the parties have agreed that if we're going to dive into this... The board said that was overbroad. The board ruled that was overbroad. Yes, and that is in conflict with... And you don't challenge that? We did challenge that in our brief. Then the government took the position that if the court wants to address that issue, it should remand. So both parties are in agreement that if that is the issue that is dispositive in this case, this court should remand for the agency to reconcile the law. All right, thank you. For the third category, as stated, the Salvadorian police failed to investigate Mrs. Cruz's brother's murder. This is significant because the treatment of similarly situated people is relevant in asylum cases. When Mrs. Cruz was asked, has the police done anything to help your family out? She said, not so far. Join Appendix 196. The authority's lack of response in her brother's case, coupled with the country conditions in this case, shows that in El Salvador, it would have been futile for Mrs. Cruz to file a police report. In El Salvador, about one out of ten murders of women results in a conviction. For category number three. Number four, excuse me. The court also ignored legally significant evidence regarding impunity for gender-based violence. Thank you very much. You've got some rebuttals coming. Mr. Henderson. Good morning, Your Honor. May it please the court. Eric Anderson representing the Attorney General in the case before the court today. In 2014, for about three months in El Salvador, Ms. Cruz de Sion received telephone calls from somebody who said he was an incarcerated gang member. In these phone calls, he said she had to come to the prison to have sex with him and to deliver contraband, or else there would be consequences for her then-husband and son. She didn't do those things. She told them she was not going to do those things. And neither she, nor the husband, nor the son suffered any consequences. These calls ended at the end of three months when she changed her phone number. And again, there were no harm inflicted on Ms. Cruz de Sion, or the husband, or the son. She remained in El Salvador for between one and a half and two and a half months after the calls ended. No harm to her, or the husband, or the son. And, in fact, as far as the record indicates, no one has ever sought any information or sought to locate her in the many years since then. Ms. Cruz de Sion said a full and fair hearing in which to present her claim for relief to the board. The immigration judge and board considered all the evidence, and the record does not compel solely the conclusion that the government of El Salvador is unable or unwilling to control Alexander. And we'd ask the petition to be denied. I would start first on the issue of AB. Not to remind Your Honors of something you might be familiar with, but attorneys have said- Can you talk about those 28J letters now? One of the many in this case, Your Honor, yes. I said letters. 28J letters. There are several of them. That's right. And you've got these cases that you describe by initials. That's right. These are decisions of the Attorney General. That's right. Which are binding on the IJ and the BIA. I'm sorry. What was that last part again? Decisions of the Attorney General binding on the BIA. They're not binding on the Fourth Circuit. That's correct, Your Honor. That's correct. As we know, from the prior case, Attorney Generals can disagree about the resolution of issues of law. And some of that is what's going on here. But the argument that seems most relevant is that Attorney General Sessions decided a case called AB1. AB1 repeated the long-established standard that if an asylum applicant fears a private actor, she has to show that the government is unable or unwilling to control that actor. Unable or unwilling. Unable or unwilling. Are those statutory terms or Attorney General's terms? Those are Attorney General's terms, Your Honor. That's what I thought. There's been a long history since then. I was under the impression that that had been a standard for a good many years. That aspect is absolutely the standard for many years. The unable or unwilling, that's sort of become a standard, hasn't it? Isn't that Fourth Circuit law? That is, Your Honor. And the question is whether AB1 changed the result in no cases or changed the result in only a very small number of cases. Well, the question here is actually very narrow, and that is does substantial evidence support the finding that the Salvadoran government was unable or unwilling to protect this petitioner? That's correct. And the BIA and the IJ, to whom we owe some deference under the substantial evidence standard, say that they made findings that the petitioner had failed to carry her burden to prove that the Salvadoran government was unable or unwilling to protect her. And that's the narrow question before us, I think, and the question on which the BIA and the IJ decided. And so under the standard of review here, not only are we required to extend some deference to that, but I think it was the case of Consejo Fonseca that to reverse the BIA in this situation, the evidence would have to compel a finding to the contrary. The evidence would have to compel a fact finder to rule to the contrary. And that evidence is not present here. That's absolutely correct, Your Honor. I agree with all of that, Your Honor, yes. Paul, do you need to hear anything further on that?  Pardon? No. Bob, do you need to hear anything further from this? I wanted to ask you about Loper Bright. Sure. Yes. Yes, Your Honor. I wanted to ask you about Loper Bright. Okay. And these other letters that we've gotten, they're multiple letters, 28-J letters. That's right. I can start with Loper Bright. What had happened here was obviously Loper Bright removed Chevron deference from being an issue. And on the basis of Loper Bright, Ms. Cruz-DeSant argued in this court that you should not apply an unable or unwilling requirement, that a private actor can show she is eligible for asylum.  And our response to that is, on the same day I filed my answering brief, this court rejected that argument in Molina-Diaz. Did you argue in Molina-Diaz? Did I argue Molina-Diaz? Did you argue that? Were you the lawyer in that case? I was not the lawyer in that case. That's Judge Quattlebaum's decision here. I don't remember the author, Your Honor. Yeah, well, it is. February of this year. It was. It came down the same day I filed my answering brief, so it was the subject of the very first of those many 28-J letters, was that Molina-Diaz resolves this. Molina-Diaz also weighs on the substantial evidence review because it says the agency can look to the, be more persuaded by the facts in a particular case, such as Alexander being detained, not harming her from detention, her family was willing to make a police report and did not suffer harm as a result of that. Molina-Diaz says the agency can rely on that kind of evidence. Wouldn't Loeb or Bright have more force when you're talking about an agency's interpretation of a statute than it would as to a question of just reviewing agency fact-finding? Yes, Your Honor. I may have lost the Loeb or Bright thread there, but yes, Your Honor. Yeah, but the Chevron deference is out the window where we're talking about deference to a statute because that is the court's job, and that's what Loeb or Bright says. But then when we're talking about fact-finding like here, that is the agency's job. And so the same degree of the deference that we would no longer show under Chevron because courts are final authorities on statutory interpretation is not applicable where we're talking about simple agency adjudication fact-finding because that is any fact-finder's primary obligation in duty. So it doesn't mean that agency fact-finding is suddenly thrown overboard. Perfectly put, Your Honor, yes. Judge King wanted to know more about the additional 28 J letters, in particular the one about cognizability of the Salvadoran women social group. Yeah, both of those points. So moving on to that, to be clear, the government absolutely thinks this petition should be denied. But we have said if you wanted further consideration of the unable or unwilling, you could also send back the issue of the cognizability of the social group. We said that. Just before you get on that and get the unable and unwilling, I thought we had determined as of statutory manner and not as a deference matter under Chevron that that is a correct interpretation of the statute. Don't we hold at the Fourth Circuit without deference to the agency that the standard is to show that the government in a private circumstance, that the government was unwilling or unable? Yes, Your Honor. And so we're not involved in the Chevron is really irrelevant on that issue for us. That's right. Molina Diaz said that exactly, so yes, Your Honor. All right. I didn't want to, and you wanted to answer, Judge. This is on the other issue in the case, whether there is a particular social group. At the time we filed our brief, there was no published board decision, which admittedly a published board decision doesn't matter for yourselves for Chevron reasons anymore. But it definitely matters because the regulation says precedential board decisions bind immigration judges and asylum officers and people in my office certainly. So it matters if we have a precedential board decision on a group based on gender. At the time in February, we didn't have it. But now we do. We have matter of KESG, which was the subject of what I believe is the second 28-J letter. Is that the one this week? A few weeks ago, Your Honor. Two weeks ago. Three or four weeks ago. Two days ago. Not two days ago. A few days ago. Yes. I think three or four weeks. Okay. Thank you, Your Honor. There the board did decide that the group of Salvadoran women was not cognizable. It lacked the particularity required to be a cognizable social group protected by the INA. And my letter in the case said that this did not change our litigating position in this particular case, which is deny the petition, unable or unwilling. But if you disagree, you can still send cognizability back to the board. And the reasons why I think are twofold. To see whether the board would apply its holding about particularity in this court, given its own rules about particularity, which is to say in this court, particularity is a question of what does the dictionary tell you a word means. Whereas the board has always understood it to be a matter of what is the evidence about what these terms mean in a particular country. To see whether the board would apply it given this court's background or whether the board could also rely on other issues of social distinction or even the matter of an issue raised for the first time in KESG, which I would just briefly summarize as if you go through the United States Code, you're going to see many statutes granting protections on the basis of race, gender, other categories. In here we have a, in the asylum statute, we have a protection according to some of those groups, but sex and gender is explicitly not listed. And it would be a great change for an agency to suddenly decide that in 1980 in the Refugee Act, Congress had meant to extend relief and protection to individuals based solely on their sex or gender. And that's another issue the board could resolve if the case came before them. But for all the issues about unable or unwilling, we don't think that's necessary in this case. Do you have anything further? No, Your Honor. I thank you for listening, and we'd ask for the petition to be denied. It just came to you as well. Do you need anything? We're fine. Thank you. Thank you, Your Honor. Ms. Maracena, you have some rebuttal time. Thank you, Your Honor. The key inquiry here is whether the BIA ignored legally significant evidence, not whether the evidence compels the conclusion. The issue here is that the BIA did not do any fact-finding regarding the complicity of the prison guards with the gangs while incarcerated. This is what makes this case different than what happens in the United States. There is no Department of State report about the United States prison guards having complicity with gang members. The board abused this discretion because it did not grapple with the legally significant evidence or even mention it. As stated in McDougall and also in Funes-Ortiz, this court held that an agency must grapple with legally significant evidence and can abuse its discretion if it doesn't even mention it. We have four categories of evidence here, and although the 2022 report is not in the record, it does not show that the problems that were present in 2023 have changed. In Amaya, the board found that Salvadorian women was not particular because it can be subdivided. This is in conflict with Amaya v. Rosen, which states exactly the opposite. The intention of the unable or unwilling element is to protect asylum seekers when a government is unable or unwilling to protect them. In this case, in Orellana, the Fourth Circuit states that if it's futile or dangerous for the asylum seeker to report, they don't have to do that. No, but you know, in the big picture, the bigger question is, asylum is basically based on government persecution and not private conduct. Private conduct is only implicated if the private conduct can be somehow imputed to the government. And the standard we have been using is if the government is unwilling or unable to address the private conduct. And here we're talking about private conduct. You're talking about a threat from a gang member. And the question is, how do you impute that to government conduct? And the standard we've applied, and I think we've done so despite any deference under Chevron, is unwilling or unable. In this case, Ms. Cruz showed that the prisoners were in cahoots with the prison guards who were part of the government. And so it clearly shows that the government was unable or unwilling to protect these private actors. There is evidence due to an effective governmental institution. But he was still in detention, wasn't he? They didn't let him out. But they were not able to control him. And he was still able to conduct criminal activity. Well, we don't know that. I mean, he's threatened, but we don't know of any harm he caused her husband or her son, do we? It is not in the record whether he was able to effectuate the threats that he made, but he was able to send his gang associates to her home. He had seen pictures. No, we don't know of a gang associate either. We just know that there is thin evidence that he had somebody go. It could have been a friend. It could have been anybody. We don't know. All we know is the source of that. There's a thin evidence that Alexander was the source of that man's presence. But we don't even know whether that was the man. I mean, that could be a misinterpretation because he was there and he didn't deliver anything. He didn't talk to her or engage with her. It's very thin. But quite apart from that, that's why I asked you that question in the beginning, is whether he was a gang member. We knew it, and we really don't know. The fact that he had people running errands and conducting criminal activities for him on the outside of prison? You could do that in the United States. From prison, I could call up my brother and say, will you go deliver a birthday card to my wife? And that could be done, right? I don't see what's so unusual about that. The problem is that he sent someone to deliver a phone for her because he wanted to keep on threatening her and manipulating her, eventually so that he could get her to have conjugal visits with him and to bring him drugs. The intention of his constant communication with her was not a simple phone delivery. It was to conduct criminal activity. Thank you very much. Thank you. We'll come down and greet counsel and take a brief recess. This honorable court will take a brief recess.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Robert B. King